**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

DARWIN RAMOS-DAVID,

    **Petitioner,**

       **v.**

UNITED STATES OF AMERICA,

    **Respondent.**

**Civil No.** 22-1633 (FAB)
related to
**Criminal No.** 17-263 (FAB)

**OPINION AND ORDER**

**BESOSA, Senior District Judge.**

Before the Court is Darwin Ramos-David's ("Petitioner" or "Ramos-David") *pro se* motion to vacate, set aside, or correct sentence in Criminal Case No. 17-263, pursuant to Title 28, United Sates Code, section 2255 ("section 2255"), (Civil Docket No. 1); the Government's Response (Civil Docket No. 23) and Ramos-David's Reply.  (Civil Docket No. 27.)  For the reasons set forth below, the Court **DENIES** petitioner's motion to vacate his sentence **with prejudice**.  Petitioner's request for Evidentiary Hearing (Civil Docket No. 2) is also **DENIED**.

I.   **BACKGROUND**[1]

On January 3, 2017, MLR approached her gray Toyota Yaris, which was parked in front of her house (Criminal Docket No. 123

---

[1] The Court will use the facts as summarized by the Government in its response (Civil Docket No. 23) as it accurately reflects the criminal docket in 17-263 (FAB).

Civil No. 22-1633 (FAB)                                                    2

at 6.)  While MRL was accessing the trunk of the car, a burgundy car approached with several persons inside.  Id.  MRL noticed that two of the individuals had been previously walking on the sidewalk. Id.  One person got out of the passenger's side of the burgundy vehicle wearing a ski-mask, approached MRL holding a firearm, and asked MRL for the car keys.  Id.  Fearing for her life, MRL gave the keys to the person, later identified as Ramos-David.  MRL followed petitioner's instructions not to scream and to lay on the ground.  Id.  After the armed carjacking, MRL filed a criminal complaint with the Puerto Rico Police Bureau.  Id.  Approximately three months later, MRL positively identified Ramos-David as the person who approached her with the firearm and stole her car.  Id.

On March 13, 2017, JMM was working at Hydroponics of the Caribbean, a horticulture, organic, and hydro-gardening supplies store in Puerto Nuevo, Puerto Rico.  (Criminal Docket No. 123 at 6.)  On that date, Ramos-David and another individual entered the store.  Id.  Ramos-David, who did not have his face covered, provided a list of items to JMM.  Id.  While JMM was working on the list, Ramos-David and the other individual pulled out handguns and pointed them at JMM.  Id.  They took $700.00 in U.S. currency as well as merchandise consisting of light reflectors, fertilizer, lightbulbs, fans, and a black DVR from JMM.  (Criminal Docket No. 115 at 12.)  After the armed robbery, JMM called his boss and

Civil No. 22-1633 (FAB)                                                    3

the Puerto Rico Police Bureau.   (Criminal Docket No. 123 at 7.)

Approximately a month later, JMM was called to the police station

where he positively identified Ramos-David in a line-up as one of

the participants in the store's robbery.   Id.

On March 20, 2017, Ramos-David and three other individuals

surveilled a house with two occupants, entered the house, pointed

a firearm at the occupants, took the keys to a 2004 gray Toyota

Tacoma pickup truck from the occupants, and drove off with the

pickup truck.  (Criminal Docket No. 115 at 13.)  After his arrest,

Ramos-David was advised of his Miranda rights by FBI agents and

waived them.  (Criminal Docket No. 123 at 8.)  Ramos-David admitted

to his participation with three other individuals in the March 20th

armed carjacking.   (Criminal Docket No. 123 at 8.)   Ramos-David

estimated that he had committed 50 carjackings and robberies since

he had been released from prison in 2016.  (Criminal Docket No. 123

at 8.)

A.    Criminal proceedings

In February 2017, a Grand Jury returned a two-count

Indictment charging Ramos-David with:  (1) aiding and abetting in

the use, carrying, and brandishing of a firearm during a crime of

violence, a January 3, 2017 carjacking, in violation of Title 18,

United States Code, § 924(c)(1)(A)(ii), (Count One), and (2) aiding

and abetting in a January 3, 2017 carjacking, in violation of

Title 18, United States Code, §§ 2119(1) and 2.  (Criminal Docket No. 3.)  The case was assigned to United States District Judge Carmen C. Cerezo.  (Criminal Docket No. 3.)

In February 2018, Ramos-David filed a motion to suppress the line-up identification related to the January 3rd carjacking. (Criminal Docket No. 34.)  The government opposed it.  (Criminal Docket No. 43.)  The district court referred the suppression motion for a hearing before a magistrate judge.  (Criminal Docket No. 39.) At the November 2018 hearing, Ramos-David's counsel advised the Court that the parties were "working on a possible plea and requested additional time to finish the negotiations."  (Criminal Docket No. 81.)  "The Government stated that they reached an agreement and they w[ould] need one week to obtain the supervisor's approval."  Id.

In mid-December 2018, Ramos-David informed the magistrate judge about the parties' continued plea negotiation process and requested additional time to complete it.  (Criminal Docket No. 82.)  Based on this representation, the magistrate judge granted the continuance of the suppression hearing.  (Criminal Docket No. 83.)

In late January 2019, Ramos-David's counsel informed the magistrate judge that she had visited the prison facility and had discussed the government's plea offer with Ramos-David.  (Criminal

Civil No. 22-1633 (FAB)                                                    5

Docket No. 85.)    Ramos-David rejected the government's offer,
however, and requested that counsel submit a counteroffer.    Id.
Counsel then informed the court that a counteroffer had been
submitted.    Id.    Counsel advised that Ramos-David wanted to
continue with the suppression hearing.    Id.    The magistrate judge
noted the motion and rescheduled the suppression hearing for
April 4, 2019.    (Criminal Docket No. 86.)

        Prior to the date of the hearing, on March 21, 2019, the
Grand Jury returned a seven-count Superseding Indictment charging
Ramos-David with additional offenses.    (Criminal Docket Nos. 90,
92.)    In addition to the two original charges, Ramos-David was
also charged with (1) aiding and abetting in the use, carrying,
and brandishing of a firearm during a crime of violence, a
February 17, 2017 Hobbs Act robbery, in violation of Title 18,
United States Code, §§ 924(c)(1)(A)(ii) and 2 (Count Three);
(2) aiding and abetting in a February 17, 2017 Hobbs Act robbery,
in violation of Title 18, United States Code, §§ 1951(b)(3) and 2
(Count Four); (3) aiding and abetting in the use, carrying, and
brandishing of a firearm during a crime of violence, a March 21,
2017 carjacking, in violation of Title 18, United States Code,
§§ 924(c)(1)(A)(ii) and 2 (Count Five); (4) aiding and abetting in
a March 21, 2017 carjacking, in violation of Title 18, United
States Code, §§ 2119(1) and 2 (Count Six); and (5) being a felon

Civil No. 22-1633 (FAB)                                                          6

in possession of a firearm, in violation of Title 18, United States Code, §§ 922(g) and 924(d) (Count Seven). (Criminal Docket No. 90.)

On May 16, 2019, the Grand Jury returned a seven-count Second Superseding Indictment against Ramos-David. (Criminal Docket Nos. 106, 107.) The charges remained the same, but the dates were corrected from February 13, 2017, to March 13, 2017, as to Counts Three and Four and from March 21, 2017, to March 20, 2017, as to Counts Five and Six. (Criminal Docket Nos. 90, 106.) Because the suppression hearing had been already set before a magistrate judge on May 23rd, the arraignment was scheduled for that morning. (Criminal Docket Nos. 107-09.)

At the May 23rd arraignment hearing Ramos-David's counsel informed the magistrate judge that Ramos-David agreed to plead guilty to certain charges and requested that a change of plea hearing be set for the afternoon. (Criminal Docket No. 169 at 3-4.) Based on Ramos-David's express request, the magistrate judge withdrew the motion to suppress. (Criminal Docket No. 169 at 4-5.) The change of plea hearing was then set for 1:30 p.m. (Criminal Docket No. 169 at 5.)

In the afternoon of May 23, 2019, Ramos-David entered a guilty plea as to Counts One, Two, Four, and Six of the Second Superseding Indictment before the magistrate judge. (Criminal

Civil No. 22-1633 (FAB)                                                      7

Docket Nos. 115, 116, 139.)  The plea agreement submitted by the parties at the change of plea hearing expressly indicated the nature of the charges for the four offenses and their statutory minimum and maximum penalties, including the 15-year maximums for Counts Two and Six, twenty (20) years as to Count Four, along with a minimum consecutive term of seven (7) years and a maximum of life imprisonment for Count One.  (Criminal Docket No. 115 at 1-3.)

As for the advisory sentencing guidelines calculation for Count One, the plea agreement provided that "the Guideline-recommended sentence [wa]s the statutorily required minimum term of imprisonment, that is, a term of imprisonment of eighty-four (84) months." (Criminal Docket No. 115 at 5.)  As for the remaining three counts, the plea agreement provided a total offense level of twenty-five (25).  Id. at 6.  The parties did not stipulate a Criminal History Category ("CHC").  Id. at 7.  Assuming a total offense level of twenty-five (25) and a CHC of III, the grouped sentencing recommendation for the remaining three counts was seventy (70) to eighty-seven (87) months' imprisonment.  Id. at 6. The parties agreed to request (1) "a sentence of 84 months imprisonment [for Count One] to run consecutively to the sentence imposed as to Counts Two, Four, and Six; and (2) "a sentence of imprisonment within the guidelines range applicable to the [TOL]

Civil No. 22-1633 (FAB)                                                    8

of 25 when combined with the CHC as determined by the Court" for Counts Two, Four, and Six.  Id. at 7.  The plea agreement also contained a waiver of appeal provision by which Ramos-David agreed that if he were sentenced to "162 months or less," he waived the right to appeal his term of imprisonment or probation, fines, forfeiture, and term and conditions of supervised release.  Id.

The plea agreement also reflected Ramos-David's acknowledgement that he "[wa]s pleading guilty freely and voluntarily because he [wa]s guilty."  (Criminal Docket No. 115 at 9.)  He admitted (1) that he "consulted with [his] attorney and fully underst[oo]d all of [his] rights with respect to the Second Superseding Indictment pending against [him]"; (2) that he "read this Plea Agreement, carefully reviewed every part of it with [his] attorney, and ha[d] no doubt as to its contents"; and (3) that he "fully underst[oo]d this Plea Agreement and voluntarily agree[d] to it."  Id. at 11.  Ramos-David also acknowledged that he was satisfied with his counsel and asserted that she had rendered effective legal assistance.  Id. at 7.

Finally, the parties attached a stipulated version of facts to the plea agreement which Ramos-David "agree[d] . . . [wa]s a true and accurate summary of facts leading to his acceptance of criminal responsibility in connection to" the charged offenses. Id. at 12.  Ramos-David agreed, in relevant part, that:

Civil No. 22-1633 (FAB)                                                    9

> On January 3, 2017, [he], along with three other individuals took a motor vehicle from an adult female by force, violence, and intimidation. The vehicle that [he] and these three individuals took was a 2008 Toyota Yaris . . . For purposes of this plea agreement, [he] acknowledge[d] that he or those who aided and abetted him would have caused serious bodily harm to the adult female victim if doing so had been necessary to take the Toyota Yaris.
>
> For purposes of this plea agreement, [he] acknowledged that he used and carried a firearm while taking the Toyota Yaris. [He] further acknowledge[d] that he or those who aided and abetted him would have caused serious bodily harm to the adult female if doing so had been necessary to take the Toyota Yaris.
>
> On March 13, 2017, [he], aided and abetted by another individual, took $700.00 in U.S. currency, and merchandise comprising [of] light reflectors, fertilizer, lightbulbs, fans, and a black DVR, from the person and in the presence of an employee of Hydroponics of the Caribbean, a commercial business engaged in activity affecting interstate commerce. [He] did this while brandishing a dangerous weapon.
>
> On March 20, 2017, [he], aided and abetted by another individual took from the person of others a 2004 gray Toyota Tacoma . . . He did this while brandishing a dangerous weapon. [He] acknowledge[d] that if it had been necessary to cause injury to the victim to take the vehicle, he or those who aided and abetted him would have done so. . . .

Id. at 12-13.

During the change of plea hearing, Ramos-David understood that he was pleading guilty to Counts One, Two, Four, and Six of the Second Superseding Indictment. (Criminal Docket No. 139 at 3.) He also understood that he would be questioned by the magistrate judge to make sure that his decision to plead guilty

Civil No. 22-1633 (FAB)                                          10

was voluntary, and that he understood the charges, his rights, and the consequences. Id. Ramos-David also understood that he would be placed under oath, and that his answers had to be truthful, and if he did not understand something, he could ask his attorney. Id. Ramos-David was then placed under oath. Id. at 3-4.

During the plea colloquy, Ramos-David admitted that he had not received any recent treatment for a mental or emotional condition. Id. at 4. He also admitted that he had received a copy of the Second Superseding Indictment, had discussed the charges with his counsel, and had discussed with his attorney the purpose of the change of plea hearing. Id. In his own words, Ramos-David stated that "[t]he purpose [of the hearing] [wa]s to plead guilty for the aforementioned counts and to accept the time." Id. at 5.

After hearing Ramos-David's responses, the magistrate judge questioned Ramos-David's counsel whether she believed him competent to plead guilty and if he understood her explanation of the charges and the case in general. Id. In response, counsel agreed as to both questions, stating that Ramos-David was "competent and he kn[e]w what the charges [wer]e." Id. The government also had no doubts as to Ramos-David's competence to plead guilty. Id. The magistrate judge then found that "Ramos

Civil No. 22-1633 (FAB)                                              11

[wa]s competent to plead and he [wa]s aware of the purpose of the hearing." Id.

During the hearing, Ramos-David also agreed that he had read the plea agreement with the attached stipulated facts; that his counsel had explained them and translated them into the Spanish language before he signed them; and that he understood the terms of the plea agreement and its attached supplement. Id. at 7. Ramos-David also acknowledged that he had initialed each page and had signed both the plea agreement and stipulated version of facts. Id. at 7-8. He understood that by initialing and signing both documents, he agreed with everything contained in them. Id. at 8. The prosecutor then summarized the essential terms of the plea agreement, which Ramos-David's counsel agreed were correct and Ramos-David acknowledged that the parties' sentencing recommendation was correctly described. Id. at 9-10. Ramos-David also admitted that no one had threatened him or forced him to plead guilty and that he was pleading guilty of his own free will because he was, in fact, guilty. Id. at 10.

The magistrate judge also summarized in detail the four offenses and their elements for Ramos-David's benefit, and advised him about the government's requirement to prove all of the elements of each offense beyond a reasonable doubt. (Criminal Docket No. 139 at 15-20.) After the magistrate judge summarized each

Civil No. 22-1633 (FAB)                                              12

offense, Ramos-David confirmed that he wished to plead guilty to that offense.  Id.  The prosecutor later presented to the magistrate judge and Ramos-David the facts that the government would have presented at trial to prove the offenses.  Id. at 20-22.  The magistrate judge then again addressed each count, including Counts One and Two.  Id. at 22-23.  After each separate count, Ramos-David confirmed that he was "[g]uilty."  Id.

The magistrate judge concluded that Ramos-David "[wa]s fully competent and capable of entering an informed plea and that he[] [was] aware of the nature of the charges and the consequences of the plea."  The magistrate judge also determined "[t]he plea of guilty [wa]s a knowing and voluntary plea supported by a basis in fact containing each of the essential elements of the offense."  Id.

The district court adopted the magistrate judge's recommendation to which Ramos-David did not object, and accepted Ramos-David's plea of guilty.  (Criminal Docket Nos. 119, 121.)

The United States Probation Officer prepared a Pre-Sentence Investigation Report ("PSR").  (Criminal Docket No. 123.) For the advisory sentencing guidelines calculation for Count One, the PSR recommended the statutory mandatory minimum of 7-years' imprisonment, pursuant to U.S.S.G. § 2K2.4(b).  Id. at 10.  For Counts Two, Four, and Six, the PSR also followed the parties' total

Civil No. 22-1633 (FAB)                                                13

offense level of 25.  Id. at 10-11.  With regards to Ramos-David's criminal history, the PSR indicated two prior local convictions involving attempted robbery, carrying and using a firearm without a license (pneumatic weapon modality), disorderly conduct, use of violence or intimidation against public authorities, and threats. Ramos-David's four criminal history points resulted in a CHC of III.  Id. at 12-14.  Besides the convictions, Ramos-David had been arrested by state authorities involving domestic abuse and for firing and pointing weapons, carrying and using firearms without a license, and aggravated robbery.  Id. at 14-15.  With total offense level (TOL) of 25 and a CHC of III, the guideline imprisonment range was 70 to 87 months imprisonment for Counts Two, Four, and Six.  Id. at 18.

        In "The Offense Conduct" section, the PSR reflected information from reports of investigation including Ramos-David's offenses and other criminal conduct.  (Criminal Docket No. 123 at 6-8.)  It included, in part, Ramos-David's statements to FBI agents that in relation to the January 3rd carjacking incident, he was being confused with his brother during the physical line-up because of his close resemblance to him.  Id. at 7-8. Additionally, the PSR restated the parties' stipulated facts from the plea agreement.  Id. at 8-9.

The PSR also revealed that during Ramos-David's interview with the probation officer, he "accepted responsibility for the offenses as stipulated in the Plea Agreement; and expressed regret." (Criminal Docket No. 123 at 10.) Ramos-David indicated, however, that he "believes his acts did not have any type of impact on the victims." Id.

Due to Judge Cerezo's health condition, the sentencing hearing was rescheduled and later transferred to United States District Judge Daniel R. Domínguez. (Criminal Docket Nos. 126-28.) At the September 10, 2019, sentencing hearing, Ramos-David's counsel informed the district court that she had just been advised by Ramos-David that he wanted to "break the plea agreement," and that he had provided her the "reasons for doing that." (Criminal Docket No. 147 at 2-3.) Counsel explained that Ramos-David had "told [her] that he ha[d] been studying the law" and "there were legal issues that he need[ed] to bring up to the Court." Id. Based on counsel's request, the district court placed Ramos-David under oath and had him explain his reasons. Id. at 3-4.

Ramos-David informed, in part, that "today [he] advised [his] attorney that [he] want[ed] to retract [his] plea agreement because [he] believe[d] that there [wer]e things there that [he] did not do, and [he] [was] innocent, and [he] was being accused of those things." (Criminal Docket No. 147 at 4.) He wanted the

Civil No. 22-1633 (FAB)                                              15

opportunity to be able to demonstrate that he was innocent of these charges.    Id.    Ramos-David also informed the district court (1) that the day prior to the plea hearing, he had been informed by his brother that his mother had suffered a stroke, so he "was a little bit upset about that;" (2) that when he "came to court, [he] found out that instead of a suppression hearing, [he] was being made an offer to plead guilty;" (3) that on the date he signed the plea agreement, he was beaten up in jail; and (4) that the day after the plea hearing, "there was a fight."    Id. at 4-5.

Upon questioning about the plea agreement, Ramos-David acknowledged that he had pleaded guilty to Counts One, Two, Four, and Six, in which Counts One and Two involved "carjacking" and "brandishing a firearm," respectively.    (Criminal Docket No. 147 at 5.)    But he alleged that all of this was "false" because he never did a carjacking.    Id.    Ramos-David explained again that on the date that he pleaded guilty, that he "was ready for a suppression hearing."    Id.

In response to Ramos-David's allegations, the prosecutor advised the Court that when the change of plea hearing was about to proceed, counsel mentioned to him that Ramos-David wanted to know why the prior offer made to him was not available.    Id.    In presence of counsel, the prosecutor informed Ramos-David that "[t]he panorama ha[d] now changed because there [we]re additional

Civil No. 22-1633 (FAB)                                                      16

charges that, if convicted of all of them, [he] would be exposed to a sentence over 20 years, and that [wa]s why the offer [wa]s what it [wa]s." Id. Regarding Ramos-David's "flat denial of the allegations in the indictment," the prosecutor informed the district court that Ramos-David "sat for several proffer sessions, and at least one of these charges, we made derivative use of information that [Ramos-David] himself gave [the government]." Id. at 11. Thus, the prosecutor argued that Ramos-David "either lied to [him] and the agents when he said that he did it or he [wa]s lying to the Court now, or he lied at his change of plea when he pled guilty under oath." Id.

The prosecutor also noted that it was "the morning" of the sentencing hearing that Ramos-David "now ask[ed] to withdraw his plea;" and that the standard to withdraw a plea was difficult and had not been met. Id. The prosecutor also indicated that after having constantly dealt with Ramos-David and from "experience from this case," he understood that Ramos-David believed he could "talk his way out of any situation." Id.

Finally, with respect to the carjacking charged in Count One, the prosecutor acknowledged that Ramos-David had alleged that his brother had done the carjacking and that people confused them all the time. Id. Because of this, the government had tested this contention in two ways. Id. First, the prosecutor and the

Civil No. 22-1633 (FAB)                                              17

agents met with the victim who expressly affirmed the accuracy of her identification of Ramos-David. Id. at 11-12. Second, "acting in good faith" the prosecutor had the agents later meet with the victim and perform a photographic lineup with Ramos-David's brother's picture which concluded in a negative result by the victim. Id. at 12. Based on the foregoing, the government argued that Ramos-David's plea withdrawal request should be denied. Id. Alternatively, the government requested that the case be sent back to Judge Cerezo. Id.

After Ramos-David and his counsel held a brief conference and the district court heard the parties' arguments, Judge Domínguez continued the sentencing proceeding because Ramos-David insisted upon withdrawing his guilty plea and that the case belonged to Judge Cerezo. (Criminal Docket No. 147 at 8-9, 12-14.)

Two days later, defense counsel filed a motion requesting an order to determine Ramos-David's mental condition. (Criminal Docket No. 132.) Counsel indicated that on the date of and during the initial sentencing hearing, Ramos-David advised counsel and the court of his desire to withdraw his plea because he "was innocent and had plead [sic] guilty under mental stress and duress due to certain personal events that had transpired prior to the change of plea hearing." Id. Counsel also indicated that

Civil No. 22-1633 (FAB)                                                  18

after the aborted sentencing proceeding, she sat down with Ramos-David.  Id.  At the time, Ramos-David appeared "very nervous, somewhat upset, breaking voice and what seemed like eyes full of tears, [Ramos-David] explained the day/night before the [change-of-plea] hearing he had been given a beating as inmates said he was a snitch and he found out his mother had had a mild stroke." Id.  "This caused him to be confused, not understanding the court well and he proceeded with the change of plea."  Id.  Counsel requested that a psychological examination be conducted and that a report be prepared concerning Ramos-David, pursuant to Title 18, United States Code, §§ 4241(b) and 4247.  (Criminal Docket No. 132.)  Counsel also requested a hearing.  Id.

A few days later, Judge Domínguez transferred the case back to Judge Cerezo.  (Criminal Docket Nos. 137, 138.)  Three days later, on September 20, 2019, the case was reassigned by then Chief Judge Gustavo A. Gelpí to Judge Francisco A. Besosa. (Criminal Docket No. 141, 142.)

On December 11, 2019, the Court issued an Opinion and Order denying Ramos-David's motions requesting an order for determination of his mental condition and competency hearing and requesting withdrawal of the guilty plea.  (Criminal Docket No. 148.)  With respect to the competency issue, the Court considered Ramos-David's grounds "that his mother had a mild stroke

Civil No. 22-1633 (FAB)                                              19

the night before the change-of-plea hearing and that he was beaten up for allegedly being a snitch." Id. Relying on United States v. Kenney, 756 F.3d 36 (1st Cir. 2014), the Court found (1) that Ramos-David's "facts raise[d] substantially fewer concerns about [his] mental health than the facts addressed by the Kenney court;" (2) that "as in Kenney, [Ramos-David's] facts [wer]e either too general or focused on issues distinct from defendant's competency;" and (3) "the fact that [Ramos-David] was beaten by other inmates [wa]s similar to the threats that the Kenney court found insufficient to demonstrate incompetency." Id.

Considering the change-of-plea hearing, the Court also found that the facts "further enfeeble[d] [Ramos-David's] position" because "[n]othing that occurred during the . . . hearing raise[d] concerns about [Ramos-David's] competency." (Criminal Docket No. 148 at 8.) Moreover, the Court indicated that in his request, Ramos-David raised no other competency issues, especially regarding his ability to participate in his request to withdraw the guilty plea or in a sentencing proceeding. Id. The Court found that "[t]he absence of any allegations about mental incompetence before or after the change of plea hearing suggests [Ramos-David's] request for psychological examination and a competency hearing [wa]s a shot in the dark." Id. at 9. Thus, it

Civil No. 22-1633 (FAB)                                               20

found that Ramos-David's "requests for a psychological examination and a competency hearing miss[ed] the mark." Id.

As to Ramos-David's request to withdraw his guilty plea, the Court considered the relevant factors in the case law to determine a plea withdrawal and Ramos-David's reasons, including "actual innocence," "the beating at the jail," the "mother's stroke," and "discrepancy between the plea and the charges presented to the grand jury." (Criminal Docket No. 148 at 11.) It found that "[t]hese assertions d[id] not entitle him to a hearing or to withdraw the plea." Id. In support of denial, the Court found that Ramos-David's "claim of actual innocence [wa]s far from serious" because Ramos-David offered a mere conclusion and failed to offer any factual support for this claim. Id. Ramos-David had sat for proffer sessions with the government, and "the government [even] made derivative use of information given by [him]." Id. In addition, "the victim identified [Ramos-David] in a photographic lineup following an earlier claim of innocence" by him. Id. Alluding to the alleged discrepancy, the Court noted that during the plea proceeding and after hearing the government's summary of the factual basis, Ramos-David "pled guilty and raised no issues concerning those facts." Id. at 12.

The Court also found that Ramos-David failed to explain why the two events—the alleged beating at the jail and his mother's

mild stroke—merited a hearing or withdrawal of the plea. Id. at 13. The Court found that the stress caused by of these two factors did not merit withdrawal of the plea. Id. At the same time, the Court indicated and cited facts from the change-of-plea hearing showing Ramos-David's numerous interactions with the magistrate judge and his own articulation of the purpose for the proceeding, as well as the magistrate judge's detailed discussion of the charges with Ramos-David's repeated desire to plead guilty. Id. at 13-15.

Finally, the Court found that "the timing of [Ramos-David's] request to withdraw his plea weaken[ed] his request." Id. at 15. It indicated that the request was made three months after the plea was entered at the initial sentencing hearing. Id. In addition, Ramos-David had told his counsel on the day of that hearing about his desire to withdraw the plea, even though he had met with counsel prior to it. Thus, "the extended delay weigh[ed] against permitting withdrawal." Id. Accordingly, the Court denied Ramos-David's motions requesting an order for determination of his mental condition and his request to withdraw his guilty plea. Id.

Two days prior to sentencing, Ramos-David submitted a supplemental sentencing memorandum, which the Court noted. (Criminal Docket Nos. 150, 151.) Counsel informed that she went over the Court's Opinion and Order and again the PSR with Ramos-

Civil No. 22-1633 (FAB)                                                  22

David.   (Criminal Docket No. 150 at 1.)   Based on Ramos-David's request, counsel filed the supplemental motion because he wanted to "detail[] certain issues [he] underst[oo]d[] were important for the imposition of sentence."  Id.  Ramos-David raised, in relevant part, that "he maintain[ed] his innocence and the COP took place under circumstances he expressed to the Court verbally and in writing."  Id.

        When the sentencing hearing was called, the Court advised Ramos-David's counsel that it had read the sentencing memorandum and supplement.  (Criminal Docket No. 159 at 1.)  As additional support, counsel informed the Court that the previous night, she had spoken to Ramos-David's mother and she was very sick with a heart condition and had moved to the continental United States to get medical treatment, and thus, there was a factual support for what happened during Ramos-David's change of plea hearing.  Id. at 2-3.  In response, the Court indicated that it had read the change-of-plea hearing transcript, and on that date, it did not appear that "Ramos was not in any shape that he could not make a knowing and voluntary plea" and thus, the Court did not "allow him to withdraw it."  Id. at 3.  Being frank, counsel informed that Ramos-David would appeal.  Id. at 3-4.

        In allocution, Ramos-David argued, in part, that he was innocent and would appeal because his "plea [should] be reverted

Civil No. 22-1633 (FAB)                                                   23

[sic]."   (Criminal Docket No. 159 at 5.)   He now claimed that on the date of the change of plea hearing, he "was really anguished." Id.   He also claimed that he felt "a lot of external pressure." Id.

When questioned by the court as to alleged external pressure, Ramos-David asserted that besides his mother's health issue, he was "about to fight a suppression" when he "went to the courtroom," and "got this plea offer" where he was facing "20 to 30 years."   Id. at 5-6.   But he "always stated that [he][was] innocent."   Id. at 6.   Thus, at the moment of the guilty plea, Ramos-David informed that he "felt a load" and "felt a lot of pressure."   Id.   The district court continued questioning Ramos-David regarding the mother's health issue before he signed the plea agreement.   Id. at 6-7.

In response, the prosecutor advised the Court that he had "to correct any misstatements and misrepresentations that he kn[e]w to be true." (Criminal Docket No. 159 at 7.)   The prosecutor informed that Ramos-David "made admissions in [his] presence of committing carjackings, of committing robberies, some of which --- many of which [wer]e not even charged."   Id.   The government also originally gave a 90-month plea offer but "[t]hen a motion to suppress followed."   Id. at 7-8.   After this motion, Ramos-David's counsel requested documents.   Id. at 8.   Counsel made clear that

Civil No. 22-1633 (FAB)                                                    24

this document request was made "at her client's request."  Id.

When the prosecutor obtained the documents to provide in discovery,

he learned from them about additional criminal conduct that Ramos-

David "had engaged in, many of which he made admissions about in

[his] presence."  Id.  The prosecutor argued that Ramos-David

"either lied to [him], he lied to the Court when he changed his

plea, or he [wa]s lying to the Court now."  Id.

Ramos-David was sentenced to eighty-four (84) months

imprisonment at to Count One, to be served consecutively to ninety-

six (96) months as to Counts Two, Four, and Six, the latter counts

would be served concurrently with each other, for a total of one

hundred eighty (180) months imprisonment.  Id. at 12.

   **B.    The appeal**

On appeal, Ramos-David, represented by the same

attorney, challenged the denial of his motion to withdraw his plea

and for mental competency evaluation and his sentence.  The First

Circuit Court of Appeals affirmed.  United States v. Ramos-David,

16 F.4th 326 (1st Cir. 2021).  Of relevance here, the court of

appeals rejected Ramos-David's claim of lack of voluntariness.

Id. at 333-34.  As to Ramos-David's suppression challenge, the

court of appeals observed that "[w]hile this motion may (or may

not) have had merit, he abandoned it after months of plea

negotiations:  he withdrew it prior to his change-of-plea hearing

after a plea agreement had been signed in which he admitted involvement in the January 3, 2017 carjacking." Id. at 334. Ramos-David did not seek further direct review. Petitioner then timely moved to vacate his conviction and sentence, (Civil Docket No. 1) which was filed within one year of his conviction being final. See Clay v. United States, 537 U.S. 522, 524 (2003).

## II.  STANDARD OF REVIEW

Pursuant to 28 U.S.C. section 2255, "[a] prisoner in custody under sentence of a court established by [an] Act of Congress . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "[T]he statute provides for post-conviction relief in four instances, namely, if the petitioner's sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998) (citing Hill v. United States, 368 U.S. 424, 426-27 (1962)). Claims that do not allege constitutional or jurisdictional errors are properly brought under section 2255 only if the claimed error is a "fundamental defect which fundamentally results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." Id.

Civil No. 22-1633 (FAB)                                                    26

A motion under section 2255 is not a substitute for a direct appeal.  Foster v. Chatman, 136 S. Ct. 1737, 1758 (2016).  As a result, "as a general rule, federal prisoners may not use a motion under 28 U.S.C. § 2255 to relitigate a claim that was previously rejected on direct appeal."  Id. (citations omitted).  Moreover, "[c]ollateral relief in a § 2255 proceeding is generally unavailable if the petitioner has procedurally defaulted his claim by failing to raise the claim in a timely manner at trial or on direct appeal."  Bucci v. United States, 662 F.3d 18, 27 (1st Cir. 2011) (quotation marks and citations omitted).  If a section 2255 petitioner does not raise a claim on direct appeal, that claim is barred from judicial review unless petitioner can demonstrate both (1) cause for the procedural default and (2) actual prejudice resulting from the error asserted.  Id., United States v. Frady, 456 U.S. 152, 167-68 (1982).

**III. DISCUSSION**

In his 2255 petition, Ramos-David raises two types of challenges.  The first is a set of substantive challenges to this Court's jurisdiction for what he describes as (1) the Bartkus exception where his local lineup identifications should have been suppressed and the transfer to the federal legal system resulted in a sham prosecution and a violation to the Double Jeopardy Clause and his due process rights (Civil Docket No. 1-1- at 25-27);

Civil No. 22-1633 (FAB)                                                27

(2) the absence of a plaintiff with an injury required for standing. Id. at 26; and (3) mootness at the outset based on a lack of case or controversy and jurisdiction. Id. at 29-30. Petitioner's second set of challenges derives from his allegation that his trial attorney had a conflict of interest, rendered ineffective assistance of counsel, and failed again on appeal. Id. at 31-45. Finally, petitioner raises a claim of actual innocence. The court will first address the claim of actual innocence as raised by Ramos-David.

A.    **Actual innocence**

In order for a petitioner to establish actual innocence, he must meet various requirements. To establish actual innocence, petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley v. United States, 523 U.S. 614, 623 (1998). "Actual innocence means factual innocence, not mere legal insufficiency." Id. The Supreme Court has stated that "Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup v. Delo, 513 U.S. 298, and House v. Bell, 547 U.S. 518, or the expiration of the AEDPA statute of limitations." McQuiggin v. Perkins, 569 U.S. 383, 386 (2013). By the same token the Supreme Court has stated:

Civil No. 22-1633 (FAB)                                                   28

> "We caution, however, that tenable actual innocence
> gateway pleas are rare: '[A] petitioner does not meet
> the threshold requirement unless he persuades the
> district court that, in light of the new evidence, no
> juror, acting reasonably, would have voted to find him
> guilty beyond a reasonable doubt.' Schlup. 513 U.S. at
> 329; See House, 547 U.S. at 538." McQuiggin v. Perkings,
> 5699 U.S. 383, 386 (2013).

Ramos-David has failed in his attempt to claim actual innocence; the Court is unpersuaded.  The Supreme Court made it clear in Schlup that for a claim of actual innocence to be credible "such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not present at trial. 513 U.S. at 324".  Riva v. Ficco, 803 F.3d 77 at 84 (1st Cir. 2015). Ramos-David provided no new evidence to support his allegation of actual innocence.

Petitioner admitted, both by signing his plea agreement and admitting under oath his guilt as to the charges against him, as well as accepting the factual basis that supported his guilty plea.  Furthermore, Ramos-David held multiple proffer sessions with government representatives in which he admitted to the carjackings and robberies charged as well as to his participation in other offenses which the government had not been aware of. Ramos-David has not presented any new evidence that would annul

his admissions made under oath, as well as the evidence against him.

Petitioner's statements made under oath in open court during the change of plea hearing carry a strong presumption of veracity.  The court should "not permit [him] to turn his back on his own representations to the court merely because it would suit his convenience to do so."  United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994).  See also United States v. Alegría, 192 F.3d 179, 86 (1st Cir. 1999).

As the First Circuit Court of Appeals indicated in its opinion and order on the matter, "Ramos' protestations of innocence as to the January 3, 2017 carjacking are directly refuted by the stipulation of facts that he signed as part of his plea agreement, the PSR that he did not object to, his affirmation to the probation officer that he was guilty of the crimes to which he pleaded, and his confirmations during the plea colloquy that he was guilty of the January 3, 207 carjacking."  Ramos-David v. United States, 326 F.4th 326, 334 (1st Cir. 2021).

The court of appeals also indicated that "Ramos points to his longstanding claims of innocence and his refusal to plead multiple times in the past.  He claims that he was taken by surprise by the offer of a plea agreement on the day of the suppression hearing.  But his protestations of surprise ring hollow as the

Civil No. 22-1633 (FAB)                                                    30

plea negotiations spanned multiple months . . . without any evidence to support the credibility of his claim of innocence, this factor weighs against Ramos." Id.

Mere allegations of actual innocence with no additional new evidence with a clear record attesting to petitioner's admissions to the crime, make it clear that Ramos-David has failed to meet the narrow threshold of actual innocence. As such petitioner's allegation of actual innocence is **DENIED**.

**B.    Bartkus Exception**

Ramos-David alleges that his line up conducted by state authorities in which he was identified as one of the carjackers should have been suppressed, and that in order to avoid suppression, his case was transferred from Commonwealth jurisdiction to federal jurisdiction, triggering double jeopardy and the Bartkus exception. Petitioner is mistaken.

In Bartkus the defendant was tried and acquitted in federal district court for robbery. After the acquittal he was indicted by an Illinois grand jury for the same robbery. He was then tried and convicted of this robbery in Illinois state court. The defendant appealed his conviction and the Supreme Court concluded that the appeal did not support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the

Civil No. 22-1633 (FAB)                                                     31

Fifth Amendment against a retrial of a federal prosecution after an acquittal.  It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby essentially another prosecution.  Bartkus v. Illinois, 359 U.S. at 123-124 (1959).

The exception states that "the Double Jeopardy Clause may be violated despite single prosecutions by a separate sovereign can be said to be acting as a tool of the other."  United States v. Ayala, 47 F.Supp. 2d 196, 200 (PR 1999) citing United States v. All Assets of G.P.S. Automotive Corp., 66 F. 3d 483, 494 (2nd Cir. 1995).

The First Circuit Court of Appeals has emphasized that the Bartkus exception is narrow.  The doctrine applies exclusively where "one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings."  United States v. Guzmán, 85 F.3d 823, 826 (1st Cir. 1996).

In Guzmán, the court of appeals established the test for meeting the Bartkus exception.  The defendant must proffer sufficient evidence to establish a *prima facie* case that the dual sovereignty rule should not apply "because one sovereignty was a pawn of the other, with the result that the notion of two supposedly independent prosecutions is merely a sham."  Guzmán, 84

Civil No. 22-1633 (FAB)                                                      32

F.3d at 827.  If the defendant establishes this *prima facie* case, then, "the government must shoulder the burden of proving that one sovereign did not orchestrate both prosecutions, or, put another way, the one sovereign was not a tool of the other."  Id.

Ramos-David has failed to proffer evidence complying with the required criteria and has failed to meet the entry level requirement.  "Mere overlap between two prosecutions does not establish a double jeopardy violation."  United States v. Félix, 503 U.S. 378, 386 (1992).  Further, even significant cooperation between state and federal authorities does not provide a basis for applying the Bartkus exception."  United States v. G.P.S. Automotive Corp., 66 F.3d 483, 495 (2nd Cir. 1995).

The key question is not whether the prosecutions overlap, but whether they are independent.  In this case, there is no evidence that the federal authorities are being manipulated by the Commonwealth or *vice versa*.  Ramos-David's mere allegation that his local line up identification should have been suppressed is insufficient to meet the Bartkus test.  Mere cooperation between state and federal officials does not trigger the Bartkus exception. United States v. Jordan, 870 F. Supp. 1313, 1023 (D. Maine 1990). Ramos-David has clearly failed to offer any evidence to carry his entry level burden.  Nothing in petitioner's argument suggests that the federal authorities were merely handmaidens of the local

Civil No. 22-1633 (FAB)                                                  33

authorities or *vice versa*.   Guzmán, 823, 828.   Ramos-David's allegation regarding the Bartkus exception is **DENIED**.

### C.   Absence of a victim with an injury

Apparently, Ramos-David is under the mistaken impression that "his acts did not have any type of impact on the victims." (Civil Docket No. 123 at 10.)  This impression is patently false. Petitioner pled guilty of committing violent offenses against victims.   In stipulating to the facts supporting his plea and initialing the facts concerning each charge, Ramos-David admitted that he had participated in all three events and that he or those who aided and abetted him were prepared to cause serious bodily harm to both carjacking victims if doing so had been necessary to take the vehicles." Ramos-David, 16 F. 4th at 330.  It is ludicrous to believe that a carjacking by force with a dangerous weapon does not cause harm to a victim of a carjacking.   Petitioner's allegation is **DENIED**.

### D.   Lack of case or controversy and jurisdiction

Federal courts have jurisdiction to adjudicate a criminal charge if "the indictment alleges an offense under U.S. criminal statutes."  United States v. Prado, 933 F.3d 121, 134 (2nd Cir. 2019).  See 18 United States Code, section 3231.  "The standard for the sufficiency of an indictment is not demanding." United States v. Balde, 943 F.3d 73, 89 (2nd Cir. 2019), and

Civil No. 22-1633 (FAB)                                              34

requires little more than the indictment "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," United States v. Stringer, 730 F.3d 120, 124 (2nd Cir. 2013).

The charges in the superseding indictment to which petitioner pled guilty and was convicted of clearly meet this standard.  As for the lack of case and controversy this argument is also inaccurate and without any basis in fact.  Ramos-David's allegations are **DENIED**.

**E.    Ineffective assistance of counsel**

To establish ineffective assistance of counsel, a defendant must show that:

1.    His attorney's performance was deficient, and

2.    The deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984).

To establish deficiency, a defendant must establish that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms."  Strickland 466 U.S. at 688.  Under Strickland, counsel is presumed to have acted within the range of "reasonable professional assistance," and it is defendant who bears the burden of "overcoming the presumption that, under the circumstances, that challenged action 'might be considered sound trial strategy.'"  Strickland, 466 U.S.

at 689. To show prejudice, a defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. This assessment, however, "must be a 'fairly tolerant' one because 'the Constitution pledges to an accused an effective defense, not necessarily a perfect defense or successful defense.'" Moreno-Espada v. United States, 666 F.3d 60, 64 (1st Cir. 2012) quoting Scarpa v. Dubois, 38 F.3d 1, 8 (1st Cir. 1994).

A claim of ineffective assistance of counsel "requires a court to first assess whether 'counsel's representation fell below an objective standard of reasonableness.'" Padilla v. Kentucky, 130 S.Ct. 1473, 1482 (2010). Petitioner was obligated to show both that counsel's performance fell below an objective standard of reasonableness and that prejudice resulted from it, Strickland, 466 U.S. at 687. See also López-Nieves v. United States, 917 F.2d 645, 648 (1st Cir. 1990). He must show that counsel's performance was not reasonable as to each particular instance in which he claims that his counsel's assistance was ineffective. Counsel's performance must be examined "not in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented."

Civil No. 22-1633 (FAB)                                          36

United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1992).  The

"range of reasonable professional assistance" is quite wide.  See

Strickland, 466 U.S. at 689.  Accordingly, the Supreme Court has

indicated that "judicial scrutiny of counsel's performance must be

highly deferential."  See Strickland, 466 U.S. at 689.  As recently

reiterated by the First Circuit Court of Appeals, "[o]nly when

counsel's strategy was 'so patently unreasonable that no competent

attorney  would  have  made  it'  may  we  hold  such  performance  as

deficient.  'Review of counsel's performance must be deferential,

and  reasonableness  must  be  considered  in  light  of  "prevailing

professional norms.'"  Watson v. United States, 37 F.4th 22, 28

(1st Cir. 2022) (internal citations omitted).

        Under  Strickland,  petitioner  is  required  to  identify

acts or omissions by counsel which must be outside the wide range

of  professional  competent  assistance  and  the  harm  such  actions

caused.  Furthermore, "a defendant's failure to satisfy one prong

of  the  Strickland  analysis  obviates  the  need  for  a  court  to

consider the remaining prong."  Moreno-Espada v. United States,

666 F.3d 60, 64 (1st Cir. 2012) (quoting Tevlin v. Spencer, 621

F.3d 59, 66 (1st Cir. 2010).

        "The  requisite  showing  of  prejudice  requires  more  than

postulating that counsel's 'errors had some conceivable effect on

the outcome of the proceeding.'"  Argencourt v. United States, 78

F.3d 14 at 16 (quoting Strickland, 466 U.S. at 693).  This showing "presents a high hurdle."  Id.  "Strickland places the burden on the defendant, not the [government], to show a reasonable probability that the result would have been different."  Wong v. Belmontes, 558 U.S. 15, 27 (2009) *per curiam* (internal quotation marks omitted); See Wilder v. United States, 806 F.3d 653, 658 (1st Cir. 2015).  Under Strickland, "[a] reasonable probability is one 'sufficient to undermine confidence in the outcome.'"  Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012) (quoting González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001)); See Strickland, 466 U.S. at 694.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  Strickland, 466 U.S. at 691; See Bobby v. Van Hook, 558 U.S. 4, 12-13 (2009) (*per curiam*).  "In weighing the prejudicial effect of counsel's errors, [this Court] must consider the totality of the evidence before the judge or jury."  Turner, 699 F.3d at 584.  To show prejudice in the context of a guilty plea, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985).  Failure to satisfy one of the Strickland prongs is fatal; therefore, a court is free to

Civil No. 22-1633 (FAB)                                               38

tackle either prong first.  United States v. Carrigan, 724 F.3d
39, 44 (1st Cir. 2013).

### F.    Failure to challenge jurisdiction

Ramos-David alleges that his counsel was ineffective
because she failed to challenge the jurisdiction of this Court.
Petitioner's allegations refer to her prior arguments under
Bartkus and jurisdiction which have already been disposed of by
this Court.  Simply put there was no jurisdictional challenge to
be raised; counsel could not be ineffective for failing to raise
a meritless claim.  Acha v. United States, 910 F.2d 28, 32 (1st
Cir. 1990).

### G.    Factual Discrepancies

Ramos-David's allegations of factual discrepancies
against both trial and appellate counsel[2] are meritless.  The dates
of the crimes in the superseding indictment were listed as "on or
about."  (Criminal Docket No. 106.)  An exact date as to when the
charged crime was committed is not needed in order for it to be
properly charged in the indictment.  United Sates v. Pina-Nieves,
59 F.4th 9, 24 (1st Cir. 2023).

As to the alterations of the plea agreement there can be
no allegation of ineffective assistance of counsel.  Criminal

---

[2] Attorney Lizarríbar was petitioner's counsel both at the trial and appellate
level.

Civil No. 22-1633 (FAB)                                                    39

Docket No. 115, which is the plea agreement entered into and signed by petitioner, reflects several corrections made in ink and initialized by all parties involved, including Ramos-David.  After the corrections were made[3] Ramos-David under oath accepted responsibility and pled guilty to the counts contained in the plea agreement.

Furthermore, petitioner fails to explain how these corrections to which all parties agreed make his plea agreement a "legal impossibility" or what further investigation would reveal. There can be no ineffective assistance of counsel regarding meritless allegations.  "The burden is on the petitioner to make out a case for section 2255 relief."  David v. United States, 134 F.3d 470, 474 (1st Cir. 1998).  Ramos-David's allegation is **DENIED**.

### H.    Conflict of interest

The brunt of Ramos-David's allegations against counsel rests on the assumption that attorney Lizarríbar encouraged petitioner to lie to the prosecution during several proffer meetings with the government, and that she also encouraged him to lie to the Court under oath at the change of plea hearing.  (Civil Docket No. 1-1 at 39-41.)

---

[3] The record reflects that there were corrections made as to the count number of the superseding indictment for which petitioner was accepting responsibility, as well as the VIN number of the vehicle which Ramos-David admitted that he carjacked.  (Criminal Docket No. 115.)

This is not the first time Ramos-David has raised these allegations.  The record reflects that petitioner raised the allegation in his motion to withdraw his guilty plea which was denied by the court; and once again raised on appeal before the First Circuit Court of Appeals, which also did not find the allegation viable.  Petitioner is precluded from relitigating issues that were already disposed of under the guise of ineffective assistance of counsel.  See United States v. Michaud, 901 F.2d 5 at 6; Singleton, 26 F.3d at 240.

The Court has provided a detailed summary of the events prior to petitioner's guilty plea and sentence.  The record is patently clear that Ramos-David rejected the government's initial plea offer on more than one occasion,[4] requested additional documents, and that because of those additional documents requested by petitioner, additional investigations were conducted which resulted in new charges and a higher plea offer.  (Criminal Docket No. 159 at 8.)  Ramos-David cannot have his cake and eat it too.  There has been no showing of ineffective assistance of counsel or conflict of interest between his counsel and the government.  What the record shows is a petitioner that thought he

---

[4] As of late January 2019, Ramos-David rejected the government's initial plea offer, when no superseding indictment had been charged.  He further instructed his counsel to submit to the government a counteroffer which she did.  (Criminal Docket No. 83.)

could out smart those investigating him and that he could quite literally get away with crimes unknown to the government.  Ramos-David is mistaken.  His allegation is **DENIED.**

All claims presented by Ramos-David are unsubstantiated and clearly contradicted by the record.  Mere assertions without any evidentiary support are insufficient to warrant collateral relief.  United States v. Jiménez, 498 F.3d 83 (1st Cir. 2007); Cody v. United States, (1st Cir. 2001).

## I.    Evidentiary Hearing

Ramos-David, as part of his 2255 Petition, requested an evidentiary hearing.  Petitioner has failed, however, to meet the requirements for such a hearing to be granted.

For petitioner to prosper in his request, he must be able to demonstrate to the Court by a preponderance of the evidence, not only an entitlement to the 2255 Petition for relief, but also entitlement to an evidentiary hearing, David v. United States, 134 F.3d 470, 477-478 (1st Cir. 1998); Reyes v. United States, 421 F.Supp. 2d 426, 430 (D.P.R. 2006).  Inasmuch as petitioner has failed in his burden for relief pursuant to section 2255, he has failed as well in his request for an evidentiary hearing.  Accordingly, petitioner's request for an evidentiary hearing (Civil Docket No. 2) is **DENIED.**

Civil No. 22-1633 (FAB)                                                    42

## IV.   CONCLUSION

For the reasons stated, petitioner Darwin Ramos-David's Motion under 28 U.S.C. § 2255 (Civil Docket No. 1) is **DENIED**.  This case is **DISMISSED with prejudice**.   Judgment shall be entered accordingly.

## V.    CERTIFICATE OF APPEALABILTY

No certificate of appealability shall be issued in the event that petitioner files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, March 20, 2026.

<div style="margin-left:40%">

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE

</div>